IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


RYAN BEACH, et al.,                              )
                                                 )
                              Plaintiffs,        )
                                                 )
        vs.                                      )
                                                 )
UNITED STATES OF AMERICA, et al.,                )
                                                 )        No. 4:20-cv-0034-HRH
                              Defendants.        )
_____          )


O R D E R

Motion to Dismiss

Defendant the United States of America moves[1] to dismiss all claims asserted against it by plaintiffs Ryan, April, K.B., R.B. Jr., and L.B. Beach. This motion is opposed.[2]  Oral argument was not requested and is not deemed necessary.

Background

On February 28, 2019, Ryan Beach, who was employed by Corvias Group, LLC ("CG"), was working at a premises located at 2168 Midnight Sun Drive, Apartment A, on

_____

[1]Docket No. 36.

[2]Docket No. 107.

-1-

Eielson Air Force Base in Alaska.[3]  Plaintiffs allege that on that day, Ryan was electrocuted "by unreasonably dangerous electrical wiring in the kitchen of the premises."[4]  Plaintiffs allege that the "[k]itchen appliances at the premises were 'double wired.'  That is, one appliance was hot wired to more than one circuit breaker."[5]  Plaintiffs allege that "[t]he outlet that electrocuted Ryan was required to have a Ground Fault Circuit Interrupter (GFCI)[,]" which it did not have.[6]  Plaintiffs allege that "[t]he electrocution caused Ryan to suffer an aortic dissection, stroke, and other serious medical conditions."[7]

Plaintiffs allege that the electrical wiring was negligently installed, inspected, and approved in the 1990s by one or more of four contractors:  Ben Lomond, Inc.; VECO Construction, Inc.; HEBL, Inc.; and/or Worley Alaska, Inc.  The Building in which the premises at issue are located was "constructed as a part of a Section 801 housing program in the 1990s."[8]  Under the Section 801 housing program, "the Secretary of the Air Force" could "'enter into a contract for the lease of family housing units to be constructed on or near [any] military installation within the United States . . . at which there [was] a validated deficit

---

[3]Second Amended Complaint at 2, ¶ 4; 5, ¶ 33; and 10, ¶ 81; Docket No. 28.

[4]Id. at 13, ¶ 114.

[5]Id. at 12, ¶ 105.

[6]Id. at 13, ¶¶ 106-107.

[7]Id. at 14, ¶ 115.

[8]Second Declaration of Walter D. Graves [etc.] at 2, ¶ 3, Docket No. 37.

-2-

in housing.'"[9]  In 1994, the United States entered into a lease with an entity called "Housing Eielson Build to Lease, which the Section 801 Lease state[d was] a successor entity to Ben Lomond."[10]  The Section 801 Lease provided that the property in question was being leased "for purposes of designing, constructing and operating a Family Housing Development" at Eielson.[11]  The 801 Lease provided that the Developer, identified as Housing Eielson Build to Lease, was solely responsible for compliance with "all applicable Federal, State, and local laws," including building codes and that "[t]he Department of the Air Force assumes no enforcement or supervisory responsibility except with respect to matters committed to its jurisdiction and authority."[12]  The 801 Lease provided that "[i]t is specifically understood that the construction of the improvements herein is a private undertaking, and the Government's sole and exclusive interest in the Lease is limited to that of lessor of the land."[13]

"The Section 801 housing program was the precursor to the current Military Housing Privatization Initiative ('MHPI')."[14]  Under the MHPI, ownership of military housing "units

---

[9]Id. (quoting Pub. L. 98-115, § 801, 97 Stat. 782 (1984)).

[10]Id. at 3, ¶ 4.

[11]Section VI Department of Air Force 40 Year Lease of Property on Eielson Air Force Base, Alaska at 1, Exhibit A, Second Graves Declaration, Docket No. 37.

[12]Id. at 5-6, ¶ 8(a), (e).

[13]Id. at 6, ¶ 9(a).

[14]Second Graves Declaration at 3, ¶ 3, Docket No. 37.

-3-

is vested in the private developer – not the government.  The developers build, own and manage the housing units.  The military tenants provide an income stream for debt refinancing repayments through assignment of their BAH [Basic Allowance for Housing] to the lockbox account."[15]

In 2013, the United States and defendant Corvias Air Force Living, LLC ("CAFL") entered into a lease as part of an MHPI project to revitalize military housing on Eielson.  The MHPI lease provided that the United States was leasing certain real property "for purposes of the development, demolition, design, construction, renovation, operation, maintenance, repair, replacement and management of a rental housing development . . . primarily for use by military personnel and their dependents. . . ."[16]  As part of the revitalization project, the United States also conveyed to CAFL, by quitclaim deed, title to "all family housing units and ancillary improvements and all personal property contained therein . . . located on lands on Eielson Air Force Base, Fairbanks North Star Borough, Alaska[,]" including the Building in which the premises in question were located.[17]  Walter Graves, "the current Air Force Housing Privatization Branch Chief at the Air Force Civil Engineering Center (AFCEC), Joint Base San Antonio - Lackland[,]" avers that "[t]he United States acquired title to the Building and other units by quitclaim from the assignee of HEBL, and concurrently conveyed

---

[15]United States' Motion to Dismiss at 8, Docket No. 36 (citation omitted).

[16]Department of the Air Force Lease of Property on Eielson Air Force Base, Alaska at 2, Exhibit 2, Plaintiffs' Response [etc.], Docket No. 107.

[17]Exhibit 3 at 1, Plaintiffs' Response [etc.], Docket No. 107.

-4-

by quitclaim deed the ownership of these housing units to" CAFL.[18]  The United States continues to own the ground on which the Building sits.

The MHPI lease provides that the housing units were being "conveyed in an 'AS IS, WHERE IS' condition without any representation or warranty by the Government concerning their condition and without obligation on the part of the Government to make any alterations, repairs or additions except as otherwise expressly provided in Condition 10."[19]  Condition 10 deals with "Environmental Protection."[20]  The MHPI lease further provides that "[e]xcept as set forth in Condition 10, the Government shall not be liable to the Lessee for any damages or losses, whether direct or consequential, incurred by the Lessee as result of the discovery of any latent or patent defect in the Base Project."[21]  The MHPI lease provides that

> the Government shall not be responsible for damages to property or injuries or death to persons that may arise from or be attributable or incident to the condition or state of repair of the Base Project, or the use and occupation of the Base Project, or for damages to the property of the lessee, or injuries or death of the lessee's officers, agents, servants, employees or tenants, or others who may be on the Base Project at their invitation or the invitation of any one of them.[[22]]

---

[18]Second Graves Declaration at 2, ¶ 1; 3, ¶ 5; Docket No. 37.

[19]Department of the Air Force Lease of Property on Eielson Air Force Base, Alaska at 5, § 3.1, Exhibit 2, Plaintiffs' Response [etc.], Docket No. 107.

[20]Id. at 14.

[21]Id. at 5, § 3.1.

[22]Id. at 27, § 14.1 (emphasis omitted).

And, the MHPI lease provides that CAFL was to "at all times preserve, maintain, repair and manage the Leased Premises and Leased Premises Improvements and keep them in good working order and condition" and to "manage[] and maintain[] [the property] in an acceptable, safe and sanitary condition in accordance with this Lease."[23]

On August 15, 2019, Ryan submitted an administrative claim to the Air Force.[24] There is no evidence that any of the other plaintiffs submitted administrative claims, although plaintiffs allege that "[a]ll conditions incident to [their] right to bring and maintain" a lawsuit against the United States "have been satisfied or waived by the US. . . ."[25] The United States does not dispute that April timely submitted an administrative claim to the Air Force but does contend that "[t]he children did not submit" administrative claims.[26] The United States contends that it denied Ryan's and April's administrative claims on April 8, 2020.

Plaintiffs commenced this action on October 8, 2020. In their second amended complaint, plaintiffs assert negligence, loss of consortium, and negligent infliction of emotional distress claims against the United States.

On August 12, 2021, the court granted in part and denied in part the United States' motion to stay discovery. The court denied the motion as to the issue of whether the United

---

[23]Id. at 25, § 11.1.

[24]Exhibit A, United States' Motion to Dismiss, Docket No. 21.

[25]Second Amended Complaint at 6, ¶ 37, Docket No. 28.

[26]United States' Motion to Dismiss at 11, Docket No. 36.

States was a project owner for purposes of the Alaska Workers' Compensation Act ("AWCA"), but otherwise granted the motion.[27]  Discovery on issues other than the project owner issue was stayed pending the outcome of the instant motion.  Discovery on the project owner issue has been completed.

Pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure,[28] the United States now moves to dismiss plaintiffs' claims against it.

<u>Discussion</u>

"A Rule 12(b)(1) jurisdictional attack may be facial or factual."  <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Circ. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  <u>Id.</u>  "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."  <u>Leite v. Crane Co.</u>, 749 F.3d 1117, 1121 (9th Cir. 2014).  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary

[27]Order re Discovery Motions at 3, Docket No. 72.

[28]Although the United States makes reference to Rule 12(b)(6) in its motion to dismiss, all of its arguments are Rule 12(b)(1) jurisdictional arguments.

judgment." <u>Safe Air for Everyone</u>, 373 F.3d at 1039. "The court need not presume the truthfulness of the plaintiff's allegations." <u>Id.</u> "'Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.'" <u>Id.</u> (quoting <u>Savage v. Glendale Union High Sch.</u>, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)). Plaintiffs have "the burden of establishing subject matter jurisdiction." <u>Friends of the Earth v. Sanderson Farms, Inc.</u>, 992 F.3d 939, 944 (9th Cir. 2021).

The United States first moves to dismiss the children's claims for failure to exhaust administrative remedies. This is a Rule 12(b)(1) facial attack.

The Federal Tort Claims Act ("FTCA") "waives the United States' sovereign immunity for tort actions and vests the federal district courts with exclusive jurisdiction over suits arising from the negligence of government employees." <u>D.L. by and through Junio v. Vassilev</u>, 858 F.3d 1242, 1244 (9th Cir. 2017). "Before a plaintiff can file an FTCA action in federal court, however, he must exhaust the administrative remedies for his claim." <u>Id.</u> "The FTCA's exhaustion requirement is jurisdictional and may not be waived." <u>Id.</u>

The United States contends that "[t]he children did not submit" administrative claims.[29] However, the United States has offered no evidence to support this contention. In their second amended complaint, plaintiffs allege that "[a]ll conditions incident to [their]

_____

[29]United States' Motion to Dismiss at 11, Docket No. 36.

-8-

right to bring and maintain" a lawsuit against the United States "have been satisfied or waived by the US. . . ."[30] In light of this allegation, which the court assumes is true for purposes of a facial jurisdictional attack, the United States' argument that the children's claims should be dismissed for failure to exhaust administrative remedies fails.

The United States next moves to dismiss plaintiffs' claims on the grounds that their claims are barred by the exclusive remedy provision of the AWCA. This is a factual Rule 12(b)(1) jurisdictional attack because the United States offered the declaration of Walter Graves in support of this argument. Although the United States argues in its reply brief that this was actually a facial attack, it is not. It was and is a factual attack.

"Under the FTCA, the United States has waived its sovereign immunity for certain tort claims." Esquivel v. United States, 21 F.4th 565, 573 (9th Cir. 2021). The waiver of sovereign immunity under the FTCA "must be construed strictly in favor of the sovereign." Foster v. United States, 522 F.3d 1071, 1074 (9th Cir. 2008). "The FTCA authorizes private tort actions against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" Jachetta v. United States, 653 F.3d 898, 904 (9th Cir. 2011) (quoting 28 U.S.C. § 1346(b)(1)). Here, the act or omission occurred in Alaska. "Accordingly, if Alaska law imposes tort liability upon a private person for any of the claims alleged in [plaintiffs'] complaint, the FTCA may waive the [United States'] sovereign

---

[30]Second Amended Complaint at 6, ¶ 37, Docket No. 28.

immunity." Id. The court must "analogize the government to a private actor in a similar situation and apply state law to determine amenability to suit and substantive liability." LaBarge v. Mariposa County, 798 F.2d 364, 366 (9th Cir. 1986).

The United States argues that it would not be amenable to suit under Alaska law because it would be considered a project owner for purposes of the AWCA. The "AWCA's exclusive remedy provision . . . states that workers' compensation is the sole remedy available to an injured employee." James v. United States, 470 F. Supp. 3d 1013, 1017 (D. Alaska 2020). "The benefit of that exclusive remedy provision extends not only to the direct employer but anyone else who is liable or 'potentially liable' for securing workers' compensation to an injured employee under AWCA." Id. (quoting AS 23.30.055). "A 'project owner' is potentially liable for securing workers' compensation for employees of the contractor if the contractor fails to do so,[31] and thus benefits from the exclusive remedy provision." Id. at 1017-18.

---

[31]In their second amended complaint, plaintiffs allege that CG "has denied [Ryan's] injury was work related and has failed to secure the payment of [workers'] compensation benefits" for Ryan. Second Amended Complaint at 10, ¶ 81, Docket No. 28. This allegation might be read two ways: (1) that CG had workers' compensation insurance, but that Ryan's injury was claimed to be not job-related, or (2) that CG did not have workers' compensation insurance. However, in his administrative claim filed with the Air Force, Ryan expressly stated that CG had workers' compensation insurance. In answer to the question, "do you carry accident insurance," Ryan responded: "Corvias Group, LLC Workers' Compensation[.]" Exhibit A at 2, United States' Motion to Dismiss, Docket No. 21. Thus, there is no doubt that Ryan's direct employer had workers' compensation insurance.

-10-

Plaintiffs allege that "[t]he FTCA trumps state Workers Compensation laws."[32] However, as the United States points out, under the FTCA, the United States is "subject to the immunities provided by the state law in whichever state the action is brought[.]" Bell Helicopter v. United States, 833 F.2d 1375, 1378 (9th Cir. 1987). One such state law is the AWCA. Id. Here, the United States is immune from suit if "an Alaska employer under the same circumstances would be immune" under the AWCA. Id. Plaintiffs' allegation that the FTCA trumps the AWCA is meritless.

Plaintiffs have also alleged that Section 11(b)(ii) of the Alaska Statehood Act preempts the AWCA.[33] Plaintiffs allege that because Eielson is a federal enclave, state statutes do not apply. However, Congress has expressly decreed that state worker's compensation laws apply on federal land. 40 U.S.C. § 3172(a) provides that

> [t]he state authority charged with enforcing and requiring compliance with the state workers' compensation laws . . . may apply the laws to all land and premises in the State which the Federal Government owns . . . and to all projects, buildings, constructions, improvements, and property in the State and belonging to the Government, in the same way and to the same extent as if the premises were under the exclusive jurisdiction of the State.

Plaintiffs' allegation that Section 11(b)(ii) of the Alaska Statehood Act preempts the AWCA is meritless.

---

[32]Second Amended Complaint at 10, ¶ 83, Docket No. 28.

[33]Id. at 11-12, ¶¶ 96-102.

Turning then to the question of whether the United States is a project owner for purposes of the AWCA, a "project owner" is defined as "a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work[.]" AS 23.30.045(f)(2). The United States argues that it meets all three parts of this definition because it "engage[d] the services of a contractor," id., namely CAFL;[34] that it did so in the course of government business; and that it enjoyed the beneficial use of the work that CAFL was hired to do, including the electrical work which CAFL had subcontracted to CG.[35] Plaintiffs disagree.

As for whether the United States "engaged the services of a contractor," id., at one point in their briefing, plaintiffs seem to be suggesting that there was no contract between the United States and CAFL. Plaintiffs cite to the following deposition testimony of Graves:

> Q. Okay. Can you tell me -- let me make sure I understand this first. The United States doesn't hire Corvias Air Force Living; am I correct?
> A. Correct.
> Q. The United States has an agreement with Continental Group, LLC; am I right?

---

[34]A "contractor" for purposes of the AWCA is defined as "a person who undertakes by contract performance of certain work for another but does not include a vendor whose primary business is the sale or leasing of tools, equipment, other goods, or property[.]" AS 23.30.045(f)(1). CAFL meets this definition.

[35]CG meets the definition of a subcontractor under the AWCA. A "subcontractor" is defined as "a person to whom a contractor sublets all or part of the initial undertaking." AS 23.30.045(f)(3).

-12-

A. Correct. A lease of land along with performance agreements on what they're going to do with it.[36]

But, plaintiffs then concede that Graves "was in error when he referred to an entity called 'Continental Group, LLC.' Specifically, as [Graves] clarified in a subsequent deposition, there is no such entity of that name[.]"[37] And, as Graves also testified, "Corvias Air Force Living is a signat[ory] on an agreement that says they're going to manage the program, and we're a signat[ory] on that agreement too[.]"[38] Moreover, the actual contract between the United States and CAFL is part of the record in this case. There can simply be no dispute that the United States and CAFL entered into a contract for military housing under which CAFL leased the land on which the Building sat and the terms of which required the United States to quitclaim the structures on that land to CAFL.

According to plaintiffs, however, that does not mean that the United States "engaged the services of a contractor." Rather, plaintiffs contend that the United States must have "engaged" CAFL to perform the <u>specific</u> work Ryan was doing when he was injured. Plaintiffs emphasize that for purposes of the AWCA, "a project owner is someone who engages the services of — that is, <u>contracts with</u> — a person to perform <u>specific</u> work. . . ." <u>Lovely v. Baker Hughes, Inc.</u>, 459 P.3d 1162, 1169 (Alaska 2020) (second emphasis added).

---

[36]Videotaped Deposition of Walter Graves via Zoom Videoconference at 38:2-11, Exhibit 1, Plaintiffs' Response [etc.], Docket No. 107.

[37]Plaintiffs' Response [etc.] at 11 n.1, Docket No. 107.

[38]Graves Deposition at 38:15-18, Exhibit 1, Plaintiffs' Response [etc.], Docket No. 107.

-13-

Plaintiffs argue that there is no contractual agreement between the United States and CAFL for the performance of the services that Ryan was providing at the time of the incident. Plaintiffs cite to a number of cases in which the Alaska Supreme Court has considered and applied the "project owner" definition, and plaintiffs contend that the Alaska Supreme Court has consistently found that a project owner is an entity which contracted for the <u>specific</u> services or work involved in the accident in question.

Plaintiffs rely heavily on <u>Lovely</u>, 459 P.3d 1162. There, "Baker Petrolite Corporation operated a chemical transfer facility on the Kenai Spur Highway." <u>Id.</u> at 1164. "Baker Hughes Oilfield Operations, Inc., entered into a construction contract with UIC Construction, LLC for construction of a replacement 'Baker Petrolite Facility' with more capacity and storage space." <u>Id.</u> "Both Baker Hughes Oilfield Operations and Baker Petrolite are subsidiaries of Baker Hughes, Inc." <u>Id.</u> The plaintiffs in the case were UIC Construction workers who "suffered chronic health problems as a result of their exposure" to mercaptan while working on the Baker Petrolite project. <u>Id.</u> at 1165. The plaintiffs "received workers compensation from UIC Construction" but then they later "sued Baker Hughes, Baker Hughes Oilfield Operations, and Baker Petrolite (collectively the corporations), alleging negligence causes of action." <u>Id.</u> The corporations, however, "contended that the workers' claims were barred because each of the corporations was a 'project owner'" for purposes of the AWCA. <u>Id.</u> at 1166. "[T]he corporations contended that if any of them was a statutory project owner, each affiliated company [was] as well." <u>Id.</u> (citations omitted). The plaintiffs

-14-

however contended that "the only corporation that might qualify as a project owner was Baker Hughes Oilfield Operations, which they said owned the land and which had entered into the construction contract as 'the Owner.'" Id. The issue before the court was "whether corporations that are not parties to a contract, but are related to a corporation that is a party, may be 'project owners' under the Act and therefore protected from liability to the same extent as employers." Id. at 1168. The Alaska Supreme Court "conclude[d] that a project owner is someone who engages the services of — that is, contracts with — a person to perform specific work and enjoys the beneficial use of that work." Id. at 1169. The court rejected an argument by the corporations that the indemnity provisions in the applicable contract played a role in the "project owner" analysis. The court explained that "regardless of how the corporations defined themselves by contract, and regardless of the obligations they claim to have assumed, whether they are protected from third-party liability as project owners still depends on whether they satisfy the statutory definition." Id. at 1171.

Plaintiffs also cite to Schiel v. Union Oil Company of California, 219 P.3d 1025 (Alaska 2009). There, "Schiel sued Union Oil Company of California (UNOCAL or the company) for injuries he suffered when he was working on UNOCAL's Grayling Drilling Platform. Schiel was an employee of Peak Oilfield Services at the time of the injury." Id. at 1028. "UNOCAL moved for summary judgment, arguing that the Alaska Workers' Compensation Act barred Schiel's tort claims because the company was Schiel's statutory employer and therefore immune from suit." Id. Although the issue before the court was

-15-

whether the project owner provision in the AWCA was constitutional, the Alaska Supreme Court referred to a master service agreement between UNOCAL and Peak that presumably encompassed the work being done by Schiel.  Id. at 1029, 1033.

Next, plaintiffs cite to Nelson v. Municipality of Anchorage, 267 P.3d 636 (Alaska 2011).  There, "the Municipality [had] contracted with Western Power & Equipment Corporation to work on remounting [a] cherry picker; that work included removing the bolts that held the cherry picker in place.  Western Power subcontracted with Alaska Concrete, Nelson's employer, to drill the bolts out of the concrete platform on which the cherry picker sat."  Id. at 638.  Nelson's employer asked him, on his day off, "to deliver drill bits to [the] job site. . . ."  Id.  While delivering the drill bits, Nelson "fell about 20 feet through [a] hole in the floor to the lower level and suffered head trauma."  Id. at 639.  Nelson "sued the Municipality . . . for negligence."  Id.  The Municipality argued that it was immune from suit under the project owner provision of the AWCA.  Id. at 640.  Nelson argued that the Municipality could not be a project owner "because, as a political subdivision of the State, it is covered by a different subsection of the statute[;]" because "the Municipality is not a 'person' for purposes of the workers' compensation act[;]" and because "the Municipality should be classified as a 'contract-awarding entity' under subsection .045(d) rather than a 'project owner[.]'"  Id.  But, Nelson did not dispute that the Municipality had "engaged the services of a contractor in the course of its business and enjoyed the beneficial use of the contractor's work."  Id. at 642, n.26.

-16-

Plaintiffs also cite to <u>Anderson v. Alyeska Pipeline Service Co.</u>, 234 P.3d 1282 (Alaska 2010). There, "Anderson was injured while working for Doyon Universal Services at Pump Station 5 on the Trans–Alaska Pipeline System. Alyeska Pipeline Service Company, which operates the pipeline, contracted with Doyon to provide security, medical support, lodging, and catering services for employees who operate and maintain the pipeline." <u>Id.</u> at 1284. Anderson was injured when she was "helping the head cook clean the loading dock area where food was stored." <u>Id.</u> Anderson "brought a tort suit against Alyeska Pipeline Service Company[.]" <u>Id.</u> Alyeska argued that it was immune from suit because it was a project owner under the AWCA. <u>Id.</u> at 1286. The Alaska Supreme Court found that

> Alyeska clearly meets the statutory definition of "project owner" in AS 23.30.045(f)(2). In the course of Alyeska's business, which is operating the Trans–Alaska Pipeline System, it engaged the services of Doyon Universal Services. No one contests that Doyon is a contractor. Doyon undertook performance of work for Alyeska, including catering services for employees who operate and maintain the pipeline.

<u>Id.</u> at 1288.

Finally, plaintiffs cite to <u>Trudell v. Hibbert</u>, 272 P.3d 331 (Alaska 2012), <u>vacated in part on other grounds on reh'g</u>, 299 P.3d 1279 (Alaska 2013). There, "Trudell was injured on June 13, 2006, when he fell while trying to descend a ladder from the roof of a structure on which he was working. At the time he was employed by Phillips Construction Co." <u>Id.</u> at 332. "The structure Trudell was working on was owned by John Brent Hibbert (Brent) and Debra Hibbert." <u>Id.</u> The Hibberts owned a taxi cab business and a property rental business,

-17-

and the structure on which Trudell was working "serve[d] as both the Hibberts' residence and the cab company's business office." Id. The primary question before the court was whether the Hibberts were acting as homeowners or business owners when they contracted with Phillips to do the repairs. If they were acting as homeowners, they could not be considered project owners because "a project owner must . . . be a business." Id. at 342. The court concluded that the Hibberts "were acting in their business capacity as commercial landlords when they contracted with Phillips" and thus could be considered project owners under the AWCA. Id. at 344.

Plaintiffs insist that the foregoing cases illustrate that in order to be considered a project owner for purposes of the AWCA, the United States must be able to show that it directly contracted with CAFL for provision of the electrical services that Ryan was performing on the day in question. But, plaintiffs argue that the United States can make no such showing because the only contract the United States had with CAFL was for a lease of real property and the transfer of ownership of the structures located on that property.

The problem with plaintiffs' argument is that none of the cases they cite address the question of how specific the contract for services must be in order to qualify an entity as a project owner. None of the cases suggest that in order to a project owner for purposes of the AWCA, the United States would have had to expressly contract with CAFL for the electrical work being done on the premises in question. While these cases suggest that there must be a nexus between what the plaintiff was doing when he or she was injured and the contract

-18-

in question, they do not stand for the proposition that a project owner must have expressly contracted for the specific services being performed by the plaintiff.

Here, there is a nexus between the United States' contract with CAFL and the work Ryan was doing at the time of the incident. The MHPI lease required CAFL to "at all times preserve, maintain, repair and manage the Leased Premises and Leased Premises Improvements and keep them in good working order and condition" and to "manage[] and maintain[] [the property] in an acceptable, safe and sanitary condition in accordance with this Lease."[39] The "Leased Premises Improvements" included the Building. In other words, the United States' contract with CAFL required CAFL to maintain the premises in good working condition and order, which would include having a working electrical system. In addition, at his deposition, Graves was asked whether "[a]s part of its obligations under the lease, was Corvias Air Force Living obligated to perform necessary renovations of the housing at issue in this case[;]" and he answered, "Yes, they were."[40] Graves explained that CAFL had an "obligation to keep the units up, and so they will submit plans . . . to do needed renovations to keep the homes safe and habitable."[41] CAFL provided the United States with a "proposal"

---

[39]Department of the Air Force Lease of Property on Eielson Air Force Base, Alaska at 25, § 11.1, Exhibit 2, Plaintiffs' Response [etc.], Docket No. 107.

[40]Graves Deposition at 111:4-8, Exhibit A, United States' Reply in Support of its Second Motion to Dismiss, Docket No. 109.

[41]Id. at 112:12-15.

for the renovation of a group of units, which included the premises in question.[42] That proposal included replacing kitchen appliances,[43] and Ryan was allegedly injured by "dangerous electric wiring in the kitchen. . . ."[44] Plainly, there is a connection between the contractual obligations which CAFL took on and Ryan's injury. Thus, the United States meets the portion of the "project owner" definition that requires that it "engage[d] the services of a contractor." AS 23.30.045(f)(2).

In order to meet the definition of a "project owner," the United States must also show that the contract in question was entered into "in the course of the person's business[.]" Id. The United States' business includes providing air defense. Its contract with CAFL was entered into in the course of doing this business.

Finally, in order to meet the statutory definition of a "project owner," the United States must show that it enjoyed the beneficial use of the renovation work being done by CAFL under its contract with the United States. Plaintiffs argue that the United States cannot show that it enjoyed the beneficial use of that work because it did not own the Building in which the premises were located. Plaintiffs argue that only CAFL could enjoy the benefits of the renovation work being done on the units because CAFL owned the units and would receive the income stream from renting the units to military personnel. Plaintiffs argue that

---

[42]Id. at 67:21-25.

[43]Eielson AFB and Corvias Air Force Living LLC Joint Proposal, Exhibit B at 5, United States' Reply in Support of its Second Motion to Dismiss, Docket No. 109.

[44]Second Amended Complaint at 13, ¶ 114, Docket No. 28.

the United States' contract with CAFL makes it clear that the United States no longer owned the housing units being renovated and that it had no responsibility for the renovations. Thus, plaintiffs argue that the United States cannot claim that it enjoyed the beneficial use of the renovation work.

This argument is not supported by Alaska law. This is best illustrated by the Anderson case, 234 P.3d 1282. As set out above, the plaintiff in Anderson was a Doyon employee who was injured while working "at Pump Station 5 on the Trans–Alaska Pipeline System." Id. at 1284. Alyeska, "which operates the pipeline, contracted with Doyon to provide security, medical support, lodging, and catering services for employees who operate and maintain the pipeline." Id. The Alaska Supreme Court held that Alyeska was a project owner for purposes of the AWCA. Id. at 1288. The court reached this holding even though Alyeska was not the "owner" of "Pump Station 5 on the Trans-Alaska Pipeline System." Id. at 1284. The Trans-Alaska Pipeline System is owned by a number of North Slope oil producers. BP Pipelines (Alaska) Inc. v. State, Dep't of Revenue, 325 P.3d 478, 480 n.1 (Alaska 2014). Alyeska "is the operating agent of the owners and operates" the pipeline for the owners. Id. (citation omitted). Thus, even though Alyeska did not own the property where Anderson was injured, the court found that Alyeska could still enjoy the benefits of its contract with Doyon.

Similarly here, the United States does not have to be the owner of the Building in order to enjoy the beneficial use of the renovation work that CAFL was doing. As set out

above, the United States' business includes providing air defense. This business requires people, and the United States arranges for housing for these people, i.e. military personnel, to be available – at the expense of the Government through housing allowances which, in this instance, are paid to CAFL. CAFL no doubt makes money through the leasing of the ground and the ownership of the residential buildings, but it is equally true that the United States benefits from having safe, well-maintained housing available for its military personnel. In short, the United States enjoyed the beneficial use of the work being done by CAFL under its contract with the United States, which means that the United States meets the third part of the "project owner" definition.

The court concludes that the United States is a project owner for purposes of the AWCA. Because the United States is a project owner under the AWCA, it "benefits from the exclusive remedy provision" of the AWCA, James, 470 F. Supp. 3d at 1018, which means that plaintiffs' claims against the United States are barred.[45]

Conclusion

The United States' motion to dismiss is granted. Plaintiffs' claims against the United States are dismissed. Plaintiffs are not given leave to amend as amendment would be futile.

DATED at Anchorage, Alaska, this 10th day of May, 2022.

/s/ H. Russel Holland
United States District Judge

---

[45]Because the United States is a project owner, the court need not consider the United States' alternative argument that the independent contractor exception to the FTCA applies.

-22-